UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| **MAINE POINTE, LLC,** Plaintiff, | ) ) ) ) ) |   |
| v. | ) ) | Civil Action No. 18-12072-DJC |
| **MICHAEL T. COLLINS and MTC INTERNATIONAL CONSULTING,** Defendants. | ) ) ) ) ) ) ) ) |   |

## <u>MEMORANDUM AND ORDER</u>

**CASPER, J.**                                                                                                  October 25, 2018

## I.      Introduction

Plaintiff Maine Pointe, LLC ("Maine Pointe") has sued Defendants Michael Collins ("Collins") and MTC International Consulting (collectively "Defendants") seeking damages and injunctive relief in connection with Collins' allegedly improper download of Maine Pointe's confidential information immediately prior to his notice of resignation from Maine Pointe.  D. 1. Maine Pointe alleges violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count I), misappropriation of trade secrets under the Massachusetts Uniform Trade Secrets Act, Mass. Gen. L. c. 93, §§ 42 *et seq.* or other Massachusetts law (Count II), breach of contract (Count III), breach of the covenant of good faith and fair dealing (Count IV) and violation of Mass. Gen. L. c. 93A, §§ 2, 11 (Count V).  Id.  Maine Pointe has moved for a temporary restraining order and/or preliminary injunction requiring that Defendants refrain from using or disclosing Maine Pointe's proprietary information, preserve all potentially relevant information and return all relevant

1

information to Maine Pointe. D. 3-4. For the reasons discussed below, Maine Pointe's motions for injunctive relief, D. 3- 4, are DENIED.

## II.     Standard of Review

Injunctive relief "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). To obtain such relief, the Court must consider: (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). The same four factors apply to motions for temporary restraining orders and for preliminary injunctions. Commerce Bank & Trust Co. v. Prop. Adm'rs, Inc., 252 F. Supp. 3d 14, 16 (D. Mass. 2017). Plaintiffs "bear[] the burden of establishing that these four factors weigh in [their] favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

## III.    Factual Background

The following facts are drawn from the complaint, D. 1, Maine Pointe's motions for injunctive relief, D. 3-4,[1] Defendants' opposition, D. 17, and the parties' supporting filings.

Maine Pointe is a global supply chain and operations firm. D. 1 ¶ 11. Collins is an operational consultant. D. 17 at 1. During his twenty-four years in the industry, Collins has worked for worked for twenty-two consulting firms and dealt directly with over ninety separate clients. D. 17 at 1-2; D. 18 ¶¶ 1, 4. Collins first worked for Maine Pointe in 2014 as an employee. D. 17 at 2; D. 18 ¶ 7. His initial employment with Maine Pointe terminated with his resignation

---

[1] Maine Pointe seeks both a temporary restraining order, D. 3, and a preliminary injunction, D. 4. Maine Pointe requests identical relief and advances identical arguments in support of both motions, D. 3-4; see D. 5-8, and, accordingly, the Court addresses these motions together.

2

in 2014. D. 18 ¶ 9. On or about April 10, 2018, Maine Pointe engaged Collins again, this time through his firm, MTC International Consulting, to perform analysis services as an independent contractor, pursuant to a written employment agreement (the "Agreement"). D. 1 ¶ 13. The Agreement imposed various non-disclosure obligations on Collins regarding Maine Pointe's confidential information, including obligations triggered by the termination of the Agreement. The Agreement contained a section called "Non-Disclosure Obligations" that, in part, prohibited Collins from using or attempting to use confidential Maine Pointe information "in any manner other than in connection with [his] engagement with [Maine Pointe]." D. 6-1 ¶ 9(a). It also stated that upon termination, Collins would be required to "promptly return" all Maine Pointe property, including correspondence, documents and memoranda, "and any copies thereof" to Maine Pointe. D. 5 at 2-3; D. 6-1 ¶ 9(a).

In conjunction with Collins' consulting work, Maine Pointe gave him access to certain electronic folders from Maine Pointe's file server, which is a cloud-based system administered by Dropbox. D. 5 at 3; D. 7 ¶ 2. Maine Pointe's Dropbox is password protected. D. 5 at 4; D. 7 ¶ 5. Through his Dropbox account, Collins had access to all of Maine Pointe's files for the client accounts on which he worked, including raw data, spreadsheets, analyses, presentations and memoranda. D. 5 at 3; D. 6 ¶¶ 6-7. Collins also had access to some internal Maine Pointe documents, including Maine Pointe's "Analysis Playbook." D. 5 at 3. The Analysis Playbook consists of "training documents, sample data, and other documents constituting a detailed roadmap of Maine Pointe's proprietary analysis program." D. 6 ¶ 7; D. 6-2. Each page of the Analysis Playbook is labeled "Confidential." D. 5 at 4; D. 6 ¶ 8; D. 6-2.

On Sunday, September 30, 2018 at 4:15 p.m., Collins logged onto Maine Pointe's Dropbox site from his residence in Florida. D. 5 at 5; D. 7 ¶ 5. During the next three hours, he downloaded

3

the contents of three Maine Pointe folders onto his computer. D. 5 at 5; D. 7 ¶ 5. Two of those folders contained client data and work pertaining to those clients and the other contained Maine Pointe documents, templates and presentations reflecting Maine Pointe's analysis program, including the Analysis Playbook. D. 5 at 5; D. 7 ¶ 5. At 8:15 p.m. that night, Collins "unlinked" his personal computer from his Maine Pointe Dropbox account. D. 5 at 5; D. 7 ¶ 7.

When Maine Pointe revokes access to Dropbox for any user, the data that has been synced to that user's computer will be deleted. D. 7 ¶ 4. If a user "unlinks" his or her Dropbox account and personal computer, however, Maine Pointe is unable to delete information from the personal computer or verify what data remains on that computer. Id. ¶¶ 8-9. Maine Pointe's Senior Director of Information Technology, Bryan Hallas, attests that he disconnected all of Collins' access to Maine Pointe computer systems, but due to Collins' "unlinking" of his Dropbox account, Hallas is unable to ensure destruction of Maine Pointe data on Collins' computer. Id.

The day after his downloading, on Monday, October 1, 2018, Collins emailed Stephen Ottley, Maine Pointe's Executive Vice President of Analysis, informing the executive that he had "made a personal decision to accept a full time position" at another company and "[would] no longer be available for contract work." D. 5 at 4; D. 8 ¶ 2; D. 8-1 at 2. The next day, Collins and Ottley spoke on the phone. D. 5 at 4-5; D. 8 ¶ 4. Collins told Ottley that he had received the job offer over the weekend, but did not identify his new employer. D. 5 at 4-5; D. 8 ¶ 4. Collins attested that his new employer does not work with any customers with whom he had worked during his time at Maine Pointe and that he had advised his new employer that he could not work on future projects with such customers for six months, D. 18 ¶ 32, in accordance with the non-competition covenant of the Agreement, D. 6-1 ¶ 9(b).

## IV. Procedural History

On October 4, 2018, Maine Pointe instituted this lawsuit. D. 1. That day, Maine Pointe also moved for a preliminary injunction and temporary restraining order. D. 3-4. On October 18, 2018, the Court heard the parties on the pending motions and took the matters under advisement. D. 22.

## V. Discussion

### A. Likelihood of Success on the Merits

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011) (explaining that "[l]ikelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a 'somewhat less' showing of another element").

#### 1. Breach of Contract

Maine Pointe argues that it is likely to succeed on the merits of its breach of contract claim. D. 5 at 6-8. To prove a breach of contract claim, a plaintiff must show there was a valid contract, the defendant breached the contract and that the plaintiff sustained injury as a result of the defendant's breach. Linton v. N.Y. Life Ins. Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005). Both parties agree the Agreement governs Collins' relationship with Maine Pointe. D. 5 at 6; D. 17 at 2. Maine Pointe argues that Collins violated at least two provisions of the Agreement and that there is strict liability for those violations. See D. 21-1 at 1-2; Boston Ship Repair, LLC v. Starr Indem. & Liab. Co, 997 F. Supp. 2d 118, 127 (citation omitted) (noting that "[c]ontract liability is

5

strict liability . . . . The obligor is therefore liable in damages for breach of contract even if he is without fault"). First, Maine Pointe argues that by downloading its data on September 30, 2018, Collins breached his contractual obligation to refrain from "us[ing] or attempt[ing] to use any [] Confidential Information in any manner other than in connection with [Collins'] engagement with [Maine Pointe]." D. 5 at 6; D. 6-1 ¶ 9(a). The Agreement defines "Confidential Information" to include, but not be limited to:

> technical information, intellectual property, business and marketing plans, strategies, Customer information, software, other information concerning the products, services, promotions, development, financing, expansion plans, business policies and practices of Company and its affiliates and other forms of information considered by Company and its affiliates to be confidential and in the nature of trade secrets (including, without limitation, ideas, research and development, know-how, formulas, technical data, designs, drawings, specifications, Customer and supplier lists, pricing and cost information and business and marketing plans and proposals).

D. 6-1 ¶ 9(a). Second, Maine Pointe argues Collins breached his obligation under the Agreement to "promptly return" all Maine Pointe property upon his departure from the company. D. 5 at 7; D. 6-1 ¶ 9(a).

Defendants counter that Maine Pointe is unlikely to prevail on the breach of contract claim because Collins last accessed the database before terminating his contract with Maine Pointe, while he was still authorized to use the files. D. 17 at 6-7. Collins also attests that he downloaded the information to avoid accidental deletion of the documents, has not used the information he downloaded, has no intention of using it and has expressly offered to return the files to Maine Pointe. D. 18 ¶¶ 45, 56-57, 60.

The Court concludes that Maine Pointe has not met its burden to show it is likely to succeed on its breach of contract claim. Maine Pointe has offered no evidence, circumstantial or otherwise, to show that Collins has "use[d] or attempt[ed] to use" confidential information other than "in

connection with" his engagement with Maine Pointe. The uncontroverted affidavit of Collins attests that since unlinking his computer, he has not "use[d], access[ed], or transmit[ted] any [Maine Pointe] files on [his] personal computer." D. 18 ¶ 50. He further attests that since being served in this case, he has accessed files on his computer only twice and "video-recorded [himself] accessing the laptop, to show exactly what files [he] accessed and copied." Id. at ¶ 53.

There is a closer question of whether Collins has "promptly returned" all materials to Maine Pointe. The Agreement does not define the term "promptly return."[2] Hallas has attested that the usual procedure is for Maine Pointe to execute the return process remotely. D. 7 ¶ 4. Maine Pointe, however, has not articulated any type of process for the retrieval of documents when a remote retrieval is not possible.[3] See Woolley's Laundry, Inc. v. Silva, 304 Mass. 383, 390 (1939) (holding that "[t]he unexpressed intentions of the plaintiff [could not] bind the defendant" in case involving employer's confidential information). Maine Pointe also did not put Collins on notice of how or when to return the documents through any regular company practices. In 2014, when Collins terminated his initial employment arrangement with Maine Pointe, Maine Pointe did not question him about the status of confidential information or request that Collins delete or return any company documents. D. 18 ¶ 9. Nor did Maine Pointe train Collins on how to use the Dropbox database in accordance with its policies. Id. ¶¶ 41-42. Finally, Collins attests that Maine

---

[2] At the hearing, Maine Pointe argued that "promptly" meant "immediately," as written in the "Term" section of the Agreement. See D. 6-1 ¶ 10 (stating that "[i]n the event this Agreement is terminated for any reason whatsoever, Contractor shall immediately deliver to Company all of Company's materials in accordance with applicable procedures of Company . . . "). Either way, the term "immediately," like the term "promptly return," is undefined in the Agreement.

[3] Collins has proposed a method of retrieval, D. 17 at 5; D. 18 ¶ 57, and the parties appear to be close to agreeing to a mutually acceptable means of conducting such retrieval using a neutral third party, D. 21-1 at 4.

7

Pointe never contacted him to discuss handling the files he downloaded from Dropbox prior to initiating this lawsuit three days after his termination. Id. ¶ 76.[4]

Given that Maine Pointe did not outline any procedures for Collins to "promptly return" the documents, or define the term "promptly return," the Court cannot conclude on the present record that Collins violated his contractual obligations. Perhaps understandably, Maine Pointe moved swiftly to enjoin Collins after his termination, allowing only three days to pass between Collins informing Maine Pointe of his departure and filing suit. The Court, however, is not prepared to say that three days (or some brief time thereafter, as implicitly contemplated in the demand letter referenced in footnote 4) is not a "prompt" return. The Court, therefore, concludes that at this juncture Maine Pointe has not shown it is likely to succeed on the merits of its breach of contract claim.

2. *Misappropriation of Trade Secrets*

Maine Pointe also argues that it is likely to succeed on the merits of its misappropriation of trade secrets claims under the Massachusetts Uniform Trade Secrets Act, Mass. Gen. L. c. 93 §§ 42 *et seq.* (effective October 1, 2018) or its precursor, Mass. Gen. L. c. 93 §§ 42, 42A (2017) (effective until October 1, 2018), or Massachusetts common law. D. 5 at 7-8. As a preliminary matter, the Massachusetts Uniform Trade Secrets Act does not apply to any violations that occurred before October 1, 2018 or began prior to October 1, 2018 and continued past that date. See 2018 Mass. Acts c. 228, § 70. Because Collins' alleged violation occurred on September 30,

---

[4] Maine Pointe was in the process of drafting a demand letter for Collins that set out a schedule for Collins meeting with the IT department and returning company property. 10/18/2018 Tr. 7:6-16. When Maine Pointe learned about Collins' download of information from Dropbox, however, it decided not to serve Collins with the demand letter and seek injunctive relief here instead. Id.

8

2018, and continued into October 2018, the Court concludes that Defendants are unlikely to prevail on the merits of their claim under the Massachusetts Uniform Trade Secrets Act.

Under the predecessor law, Mass. Gen. L. c. 93 § 42 (2017), anyone who "embezzles, steals or unlawfully takes, carries away, conceals, or copies . . . from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom." Mass. Gen. L. c. 93 § 42 (2017). Parties alleging misappropriation of trade secrets can seek injunctive relief under Mass. Gen. L. c. 93 § 42A.[5]

Prior to October 1, 2018, courts in Massachusetts interpreted Mass. Gen. L. c. 93, § 42 as requiring a plaintiff to show three elements to demonstrate tortious misappropriation of a trade secret: "1) the information at issue must constitute a trade secret, 2) the plaintiff must have taken reasonable steps to secure the confidentiality of the trade secret, and 3) the defendant must have used improper means to obtain the trade secret." Optos, Inc. v. Topcon Medical Sys., Inc., 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (citation omitted).

The threshold question under this inquiry is whether the material Collins downloaded constituted a "trade secret." Massachusetts law defines a trade secret as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." Mass. Gen. L. c. 266, § 30(4). A trade secret is something that gives someone "an opportunity to obtain an advantage over competitors who do not know or use it." J. T. Healey & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass.

---

[5] Mass. Gen. L. c. 93 § 42A authorized injunctive relief prior to October 1, 2018 and continues to authorize such relief in the amended statute.

728, 736 (1970). There are six factors to consider when evaluating whether information is a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972) (citation omitted).

Maine Pointe argues that the Analysis Playbook and client engagement folders that Collins downloaded constitute trade secrets. D. 5 at 3-4, 8. Maine Pointe alleges that one of its "primary advantages over it competitors is its client-customized business analysis program," which is set forth in the Analysis Playbook. D. 5 at 8. Steven Bowen, the Chairman and CEO of Maine Pointe, attests that the Analysis Playbook, in the hands of a competitor, would enable that competitor to exploit Maine Pointe's business model. D. 6 ¶ 8.

On the present record, the Court concludes that it seems likely that Maine Pointe will be able to establish that the Analysis Playbook constitutes a "trade secret" under Massachusetts law as it existed prior to October 1, 2018. The Analysis Playbook contains a step-by-step guide to Maine Pointe's approach to working with clients. Among other things, it lays out a timeline for Maine Pointe consultants with key activities that should occur for the client within that timeframe, D. 6-2 at 5, deliverables for those activities, D. 6-2 at 8, and the roles of Maine Pointe support personnel and their involvement, D. 6-2 at 9. See Advanced Micro Devices, Inc. v. Feldstein, Civ. A. No. 13-40007-TSH, 2013 WL 10944934, at *8 (D. Mass. May 15, 2013) (slip opinion) (determining that "[t]echnical specifications and business strategy data clearly satisfy" the definition of a trade secret in Massachusetts); Protégé Software Servs., Inc. v. Colameta, Civ. A.

No. 09-03168, 2012 WL 3030268, at *12 (Mass. Super. July 16, 2012) (finding that "business plans and strategies . . . may constitute trade secrets"). Each page of the Analysis Playbook is also marked "[c]onfidential." D. 6-2. Although the parties focus mainly on the Analysis Playbook, the client information Collins downloaded may also constitute trade secrets depending on its content. See Bruno Int'l Ltd. v. Victor Corp., Civ. A. No. 14-10037-DPW, 2015 WL 5447652, at * 12 (D. Mass. Sept. 16, 2015) (stating that "specific customer lists and pricing information . . . can constitute trade secrets where the information provides its holder with a competitive advantage"). Collins' argument that he does not consider the materials he downloaded to be trade secrets is undermined by the fact that Collins attests he wanted to remove his access to the Dropbox files "to avoid false accusations of improper use." D. 18 ¶ 44. Collins' anticipation of possible accusations surrounding his handling of the documents suggests his awareness of their confidential nature.

The next step in the inquiry is to determine whether Maine Pointe took "reasonable steps" to protect its confidential information. Optos, Inc., 777 F. Supp. 2d at 238. Maine Pointe argues that it took reasonable steps to protect its confidential information by restricting access "only to those with a need to know," monitoring and logging individual access and storing the information on a secure, password-protected platform. D. 5 at 8. Defendants do not address Maine Pointe's argument on this point directly, but do highlight the fact that Maine Pointe did not provide Collins with a separate work computer. D. 18 ¶ 8. On this record, the Court concludes that Maine Pointe took "reasonable steps" to protect its trade secrets for the reasons Maine Pointe has cited. See Network Sys. Architects Corp. v. Dimitruk, No. CIV. A. 06-4717-BLS2, 2007 WL 4442349, at *2, 7 (Mass. Super. Dec. 6, 2007) (concluding that defendant took sufficient steps to protect confidential information to preclude summary judgment on misappropriation of trade secret claim by reminding employees the information was confidential, "distributing information only on a

11

'need-to-know' basis[,] requiring the use of passwords[,] and storing data in alternate storage systems").

The final step of the inquiry is to determine whether Collins used "improper means" to obtain the trade secret. Optos, Inc., 777 F. Supp. 2d at 238. Collins contends that he had express permission from Maine Pointe to access the information on Dropbox and did so during the pendency of his employment relationship with Maine Pointe. On the other hand, Maine Pointe argues that "the trade secrets were downloaded without Maine Pointe's permission and in breach of multiple provisions of Collins' non-disclosure obligations." D. 5 at 8; see Optos, Inc., 777 F. Supp. 2d at 240 (stating that "[a]s a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means").

Even assuming Collins used improper means to obtain the files through Dropbox, Maine Pointe must also show the Collins made copies of the documents with the "intent to convert [them] to his own use." Mass. Gen. L. c. 93 § 42 (2017); see USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 353 (1984). Maine Pointe alleges that Collins "intentionally sabotaged [Maine Pointe's] ability to effectively remove his access to the Company information systems" to gain an advantage at his new job but does not provide any direct evidence that Collins intended to use the information. D. 5 at 5. Maine Pointe, nonetheless, argues that "[t]he circumstantial evidence is overwhelming that Collins intended and intends to use Maine Pointe's trade secrets for the benefit of his new employer." D. 5 at 10.[6] By contrast, Collins has sworn that he "ha[s] and had no intention whatsoever of using, sharing, or accessing the [Maine Pointe] documents that are present

---

[6] Maine Pointe also argues that Collins' affidavit is deficient because it "discusses only files on his personal computer and does not discuss whether he has retained, disclosed, or used any Maine Pointe documents or information separate and apart from the cache downloaded and 'synced' on September 30." Maine Pointe has not provided any evidence, however, that Collins possesses or has disclosed any such information in these other forms.

12

on [his] personal laptop." D. 18 ¶ 45. He attests that he has proposed a plan to turn over his computer to Maine Pointe, downloaded the information to avoid deleting files (which has happened to him twice this year), already stored Maine Pointe documents on his personal computer because he was not given a separate work computer and that he has told his new employer he cannot work for any clients that overlap with Maine Pointe's for six months. D. 18 ¶¶ 57, 35-38, 45-46, 32. Based on the evidence available at this early stage of litigation, the Court concludes Maine Pointe has not shown a likelihood of success in proving that Collins "intent[ed] to convert to his own use" the Maine Pointe documents.

### B. Irreparable Harm

To obtain injunctive relief, a plaintiff must also show a "significant risk of irreparable harm if the injunction is withheld." EEOC v. Astra USA, 94 F.3d 738, 742 (1st Cir. 1996). Maine Pointe argues that "[w]hen a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1, 4 (D. Mass. 2005). It also argues that the nature of the confidential information taken by Collins threatens Maine Pointe with a loss of market share and customer defections, particularly because Maine Pointe operates in a limited market. See Optos Inc., 777 F. Supp. 2d at 241 (quoting Schawbel Corp. v. Conair Corp., 122 F. Supp. 2d 71, 83-84 (D. Mass. 2000)) (stating that "[e]ven apart from the presumption of irreparable harm, the loss of market share and business relationships due to infringement may independently constitute irreparable harm"). Even without an injunction, however, Collins is bound by the Agreement and by statute not to disclose any of Maine Pointe's confidential information with his new employer or anyone else. He has also attested that since unlinking his computer, he has not accessed or disclosed any Maine Pointe files on his personal computer. And as discussed above,

Maine Pointe has failed to demonstrate a likelihood of success on its claim that Collins breached the Agreement or misappropriated information from Maine Pointe.

The denial of a preliminary injunction at this early stage in litigation does not preclude later injunctive relief if there is evidence that Collins intended to disclose confidential information. The Court concludes, therefore, that the threat of irreparable harm to Maine Pointe is not so great so as to warrant an injunction at this time.

C.     The Balance of Harms and the Public Interest

The final considerations in weighing the grant of a preliminary injunction are "a balance of equities in the plaintiff's favor, and [] service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F. 3d 168, 171 (1st Cir. 2015). Here, Maine Pointe argues that Defendants will suffer no harm by being enjoined from doing what they are already contractually bound not to do. Such argument, however, does not weigh heavily in favor of granting the extraordinary measure of injunctive relief where Collins does remain bound by the Agreement and whether he has violated the Agreement presently remains unclear. Conversely, there is some risk, as Defendants contend, that the issuance of injunctive relief could cause Collins to "suffer harm to his reputation within the industry," D. 17 at 8, if only in suggesting wrongdoing on Collins' part in exiting a consulting arrangement. As to the public interest, in the absence of a likelihood of success of the merits of Maine Pointe's primary claims, the public interest is served by holding to the parties to their Agreement (which still governs Collins' post-employment status as to Confidential Information) and allowing relief, if any is warranted, to follow the litigation of Maine Pointe's claims on the merits. Accordingly, the Court agrees with Defendants that the balance of harms and the public interest do not favor Maine Pointe in considering the issuance of preliminary injunctive relief.

## VI. Conclusion

For these reasons, the Court DENIES Maine Pointe's motions for injunctive relief, D. 3-4.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge